UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-----------------------------------------------------X

MARIA TORRES ARANGO,         :    Civil Action No. 22-7479
                             :

              Plaintiff,    :    **COMPLAINT AND JURY DEMAND**
                             :

    -v.-                       :
                             :

BROOKHAVEN SCIENCE      :
ASSOCIATES, LLC,         :
                             :

            Defendant.    :
-----------------------------------------------------X

        Plaintiff MARIA TORRES ARANGO, by and through her attorneys, LAW OFFICES OF

SHELDON KARASIK, P.C., as and for her Complaint against Defendant BROOKHAVEN

SCIENCE ASSOCIATES, LLC, states as follows:

## THE PARTIES

        1.     Plaintiff MARIA TORRES ARANGO ("Plaintiff") is an individual residing, at all

relevant times, in Suffolk County, New York.

        2.     Defendant BROOKHAVEN SCIENCE ASSOCIATES, LLC ("BSA") is a limited

liability corporation maintaining its principal place of business at 2 Center Street, Upton, Suffolk

County, NY 11973 (P.O. Box 5000, Upton, NY, 11973). BSA is a partnership between the Battelle

Memorial Institute ("Battelle"), a corporation headquartered at 505 King Avenue, Columbus, OH

43201, and the Research Foundation for the State University of New York ("RFSUNY"),

headquartered at 35 State Street, Albany, NY 12207 (P.O. Box 9, Albany, NY 12201).

        3.     The Brookhaven National Laboratory ("BNL") is a Department of Energy ("DOE")

facility located in Upton, New York. The BNL campus has approximately 1,200 DOE employees

and contractors on-site. BNL operations, facilities, and personnel are overseen by Defendant,

Brookhaven Science Associates, LLC, a federal contractor.

## JURISDICTION AND VENUE

4.      Jurisdiction in this Court is based upon 28 U.S.C. § 1331 as it involves a federal question pursuant to Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e et seq. ("Title VII") and Title I of the Americans with Disabilities Act, 42 U.S.C. §12101 et seq. ("ADA"). Additionally, this Court has supplemental jurisdiction over Plaintiffs' state law claims pursuant to 28 U.S.C. § 1367.

5.      Venue lies in this federal judicial district pursuant to 28 U.S.C. §1391(b)(1) in that Defendant's primary place of business is in Suffolk County as provided in 28 U.S.C. §1391(d).

## BACKGROUND

6.      Plaintiff Maria Torres Arango, a Hispanic woman, has been employed by Defendant, Brookhaven Science Associates, LLC ("BSA"), since 2018.

7.      Maria was a contract employee whose most recent contract with BSA ran from January 25, 2021, through September 30, 2023. At the time of her termination, she was a "tenure track" Assistant Physicist in the BNL Photon Sciences department.

8.      Maria is immunocompromised: she suffers from Hashimoto's Thyroiditis, which is a condition "in which the body's immune system mistakenly attacks the thyroid gland." SSR 14-3p: Titles II and XVI: *Evaluating Endocrine Disorders Other Than Diabetes Mellitus*, 79 Federal Register 31380 (Effective June 2, 2014).

9.      Maria gave birth via Caesarian Section on August 13, 2021. After the surgery, she took two months of recovery followed by three months of planned maternity leave. She was scheduled to return to work on January 14, 2022.

**The Reporting Requirement**

10.     On August 20, 2021, the U.S. Department of Energy ("DOE") issued an updated COVID-19 Workplace Safety Framework (the "DOE Framework"). The DOE Framework required Defendant to report to the DOE the percentage of its workforce that had been "vaccinated" (the "Vax Report"). Remote employees were to be included in this percentage.

11.     The DOE sent the Vax Report to the federal Office of Management and Budget ("OMB"), which relayed the numbers to the White House. The White House, in turn, tracked federal agencies in their progress toward maximal uptake of the state-sponsored shots. *See* White House Press Release (November 24)[1] and White House Press Release (December 9).[2]

12.     The DOE Framework *did not* require Defendant to make mandatory COVID-19 inoculation a condition of employment.

13.     In response to the reporting requirement in the DOE Framework, Defendant began implementation of its "COVID-19 Mandatory Vaccination Policy" (hereafter the "Inoculation Mandate") in September 2021. Unlike Defendant's previous policy, the Inoculation Mandate applied even to remote workers and individuals who did not need to set foot on the BNL campus.

14.     The express goal of the Inoculation Mandate was to maximize the percentage of its workforce that could be reported as "fully vaccinated" as of December 31 (i.e., by end-of-year). The relevant decisionmakers believed that it was in their personal and professional best interest to achieve the highest possible percentage.

---

[1] www.whitehouse.gov/omb/briefing-room/2021/11/24/update-on-implementation-of-covid-19-vaccination-requirement-for-federal-employees/
[2] www.whitehouse.gov/omb/briefing-room/2021/12/09/update-on-implementation-of-covid-%e2%81%a019-vaccination-requirement-for-federal-employees/

**BSA's Inoculation Mandate**

15.    In September 2021, Defendant enacted the "Inoculation Mandate," a mandatory vaccination policy for all BNL personnel, including federal employees, contractors, and subcontractors. This policy enacted a "requirement that all employees, including remote employees, must be vaccinated as a condition of employment, effective November 17, 2021."

16.    Defendant's Inoculation Mandate contemplated three options for BSA employees: (1) Submit to the "jab" (a single-shot or multiple-shot regimen of one of the Covid-19 "vaccines" that had been fast-tracked through the FDA approval process), (2) Obtain an exemption for medical or religious reasons, or (3) Involuntarily "resign" (*ostensibly without severance or the right to file for unemployment*).

17.    To be effectively "vaccinated" per the BSA policy ("inoculated"), employees were required to be "vaccinated with both shots of either the Pfizer/BioNTech or Moderna vaccines or the first and only shot of the Johnson & Johnson vaccine" and to "validate" (disclose) their inoculation status with BSA's Occupational Medicine Clinic ("OMC"). Employees were supposed to start the "vaccination" process by November 17, 2021, and to have completed a one- or two-dose regimen by December 17, 2021.

18.    In conjunction with the Inoculation Mandate, Defendant enacted a vaccination-status badge system. BSA personnel and visitors to the BNL campus were required to wear brightly colored blue (for "Validated," i.e., inoculated individuals) or orange (non-validated, i.e., leprous individuals) identification badges. These "Validation Badges" were required at all times while on BNL grounds and determined whether employees and visitors were required to mask.

19.     Employees were told via email that Defendant would make "reasonable accommodations" available for personnel seeking to avoid the Pfizer/BioNTech, Moderna, and Johnson & Johnson injections on medical or religious grounds.

20.     The Inoculation Mandate did not allow for N95 masking, remote work, or periodic testing as alternatives to the jab. Complete exemption, to be granted or denied at the discretion of BSA and its agents, was the only accommodation offered.

**Maria's Medical Exemption Request**

21.     Maria sent her medical exemption application to OMC via USPS certified mail on October 16, 2021, at the beginning of her three-month Maternity Leave. OMC confirmed receipt of her application on November 2.

22.     Maria's application cited Hashimoto's Thyroiditis (chronic hypothyroidism) as the basis for her medical exemption request.

    a.  Hashimoto's Thyroiditis is an autoimmune thyroid disease (an "AITD" in medical parlance) that requires ongoing monitoring and medication to avoid serious long-term complications.

    b.  The disease is chronic, has no known cure, and can progress from one extreme to the other -- from hyperthyroidism to hypothyroidism.

    c.  Symptoms of Hashimoto's Thyroiditis include, *inter alia*, goiter, weight gain, muscle weakness, dizziness, depression, and immune system dysfunction.

23.     Included in Maria's application was a note from her doctor, Dr. John Gil, M.D., who wrote: "P[atien]t has Hashimoto's Thyroiditis which affects her immune function. She is at high risk of adverse reaction to Covid vaccine."

24.     Dr. Gil's medical advice was based on science. In 2021, there were virtually zero scientific studies indicating whether COVID-19 inoculations were safe for individuals with AITDs. However, there was anecdotal evidence suggesting that it might have negative effects. For instance, a closely related AITD, Graves' disease, was known to interact with COVID-19 inoculations as early as May 2021. *E.g.*, Vera-Lastra, et al., *Two cases of Graves' disease following SARS-CoV-2 vaccination: an autoimmune/inflammatory syndrome induced by adjuvants*, 31 Thyroid 1436–1439 (May 2021) (doi: 10.1089/thy.2021.0142).

25.     Dr. Gil's medical advice proved to be prescient. A recent survey of the literature suggested that the COVID-19 shots are "associated with permanent or transient thyroid dysfunction in susceptible individuals." Ruggeri, et al., *SARS-CoV-2 vaccine may trigger thyroid autoimmunity: real-life experience and review of the literature* (July 2022). 45(12) Journal of endocrinological investigation, 2283–2289 (https://doi.org/10.1007/s40618-022-01863-x) (specifically citing a case involving Hashimoto's Thyroiditis).

26.     Maria was a "susceptible individual" because of her Hashimoto's Thyroiditis condition. Had she complied with the Inoculation Mandate against her doctor's recommendation, she might have suffered "permanent or transient thyroid dysfunction" as a result. *See* Ruggeri, et al., *supra*.

**BSA's Denial of Request**

27.     On November 4, 2021, Maria's request for a medical accommodation was denied.

28.     "After review," wrote OMC Director Dr. Rielly in the denial letter, "your request for exemption was denied. The rationale behind your request for exemption for the COVID vaccination requirement is not a medical contraindication based upon valid reasons, as enumerated

6

by the Advisory Committee on Immunization Practices of the United States Public Health Service and guidance from the United States Centers for Disease Control."

    a.   The exact same language was used in other medical exemption denial letters.

    b.   The United States Public Health Service ("USPHS") is not a regulatory agency; it is a branch of the nation's uniformed services. Officers of the USPHS Commissioned Corps serve as physicians, nurses, dentists, veterinarians, scientists, engineers in other regulatory agencies. They report to the U.S. Surgeon General. www.usphs.gov/about-us. The USPHS does not have an "Advisory Committee on Immunization Practices" and does not promulgate information regarding Covid-19 inoculations.

    c.   By contrast, the Centers for Disease Control and Prevention ("CDC") *does* have an "Advisory Committee on Immunization Practices" ("ACIP"). However, the CDC and ACIP are not statutorily authorized to regulate primary care physicians and do not purport to be authorities in individualized medical care. www.cdc.gov/vaccines/acip/committee/charter.html

    d.   In fact, the CDC is not a regulatory agency at all and thus cannot exert regulatory authority, including by publishing guidance on "valid reasons" for medical exemptions. *See* National Academy of Sciences, *CDC Recommendations* (1996) (https://www.ncbi.nlm.nih.gov/books/NBK233067/) ("CDC is not a regulatory agency and has no regulatory authority, even though it does have a public health mandate. Thus, the only way that CDC can exert influence is to build consensus.")

29.    BSA claimed in a November 16, 2021, email that the "medical exemption review process... was an interactive process with employees, and the review teams obtained additional

information from each applicant as needed to help reach a fully informed decision on each request."

30.     However, BSA did not engage in any dialogue with Plaintiff ("interactive" or otherwise) regarding her requested accommodation. BSA decision-makers refused to elaborate on the denial of Maria's medical exemption and made no attempt to understand or accommodate Plaintiff's medical condition.

31.     Furthermore, the reviewing doctor, Dr. Rielly, never requested supplemental information from Maria and made no attempt to contact her primary care physician, Dr. Gil.

32.     When Maria contacted Joan Williams ("Williams") in the HR department, inquiring about how to appeal the decision, Williams indicated that no appeal procedure existed.

**Aftermath of Denial**

33.     After her medical exemption was denied, BSA communicated to Maria that she had until December 17, 2021, to comply fully with the Inoculation Mandate. As articulated in a November 16 email: "Any employee whose exemption request was not approved will have until Dec. 17, 2021, to complete their vaccination series and have their status validated by OMC. Those who do not will depart the Lab on Dec. 21, 2021."

34.     On December 2, Maria received an email from Robert "Bob" Lincoln, BSA's Chief Human Resource Officer, "to remind you [Maria] of critical dates that are important for you to understand relative to your decision to either obtain the vaccination or resign from the Lab if you choose not to obtain the vaccine. You are required to be vaccinated and validated as vaccinated by Occupational Medicine Clinic ('OMC') by Friday, December 17, 2021. If you are not vaccinated and validated by Friday, December 17, 2021, your date of separation will be Tuesday, December 21, 2021."

35.     On or about December 5, 2021, Maria indicated to her direct supervisors in BNL's Complex Scattering group that although she was not voluntarily resigning, she anticipated that her employment at BNL would be terminated due to her inability to comply with the Inoculation Mandate.

36.     On Monday, December 6, her supervisors responded via email; they noted, *inter alia*, that they were "still hoping that, after weighing risks/benefits, that you'll decide on the vaccine so we can continue helping you with a career at NSLS-II" (referring to the National Synchrotron Light Source II, a machine that produces light beams that are 10,000,000,000 times brighter than the Sun, *see* https://www.bnl.gov/nsls2/about-nsls-ii.php).

37.     On December 7, the District Court in the Southern District of Georgia issued an injunction regarding mandatory inoculation of Federal contractors. *Georgia v. Biden*, 574 F. Supp. 3d 1337, 1357 (S.D. Ga. 2021) ("Defendants are ENJOINED, during the pendency of this action or until further order of this Court, from enforcing the vaccine mandate for federal contractors and subcontractors in all covered contracts in any state or territory of the United States of America.") Maria brought this to the attention of BSA on December 8, 2021.

38.     For unexplained reasons that invite speculation,[3] the "deadline" for Maria to receive her first inoculation was Thursday, December 9 – *not* Friday, December 17. Maria did not comply with the Inoculation Mandate by December 9, 2021.

39.     On December 10, 2021, Maria received a memo from Bob Lincoln. It said, *inter alia*: "As of Wednesday, December 9, 2021, you had not validated your vaccine with the

---

[3] On Thursday, December 9, 2021, the White House released a press release comparing the "vaccination" and "compliance" rates of the various Federal Agencies, including DOE. *See* White House Press Release (December 9) (www.whitehouse.gov/omb/briefing-room/2021/12/09/update-on-implementation-of-covid-%e2%81%a019-vaccination-requirement-for-federal-employees/)

Occupational Medicine Clinic (OMC). As previously communicated, the Lab will be processing your resignation, effective Tuesday, December 21, 2021."

40.     Lincoln also acknowledged in his December 10 memo "that a federal court in Georgia issued a nationwide stay on enforcement of Executive Order 14042 on Ensuring Adequate COVID Safety Protocols for Federal Contractors on December 6, 2021." Lincoln represented that Maria's involuntary "resignation" would nonetheless proceed: "Irrespective of the stay of enforcement of this Executive Order, the Lab retains the authority to require vaccination as a condition of employment, subject to applicable federal law. The Lab has acted in accordance with such authority and as such, we are moving forward and processing the resignation described above."

**Involuntary "Resignation"**

41.     On December 17, 2021, Maria received a message from an HR coordinator, Peter Cester. Peter indicated that, *inter alia*: "The process for your resignation has begun." Peter's email (subject line: "Leaving BNL effective 12/14/2021") insinuated that Maria had a "departure date" of December 14.

42.     Maria responded to Peter's email reiterating she was not voluntarily resigning from her job and clarifying that, per BSA's previous emails, her employment was to go until at least December 21. She also noted that she was scheduled to be on maternity leave until January 14, 2022.

43.     December 21, 2021, was Maria's last day of employment. She was thereafter terminated against her will for failing to accede to BSA's Inoculation Mandate.

44.     On December 22, Defendant sent someone to retrieve all BSA and BNL property from Maria, who was still on maternity leave.

**Capricious Enforcement**

45.     Not all BSA employees were treated alike under the Inoculation Mandate. BSA retained unilateral discretion to enforce the Inoculation Mandate in some instances but not in others. This discretion manifested in capricious enforcement of the policy, as in the case of Maria Torres Arango, Dennis Doherty and Matthew DiLeone.

46.     Dennis Doherty and Matthew DiLeone were, like Maria, employed by Defendant. Like Maria, Doherty and DiLeone applied for medical exemptions from the Inoculation Mandate. Like Maria, their requested accommodations were denied. Like Maria, they did not comply with the Inoculation Mandate.

47.     Unlike Maria, however, Doherty and DiLeone were not terminated. On or about December 16 or 17, 2021, they were called by BSA management and told to "keep working until further notice." Upon information and belief, Doherty and DiLeone were never required to comply with the Inoculation Mandate.

**BSA Appropriates Maria's Vacation Pay**

48.     After her termination, Maria Torres Arango was given her final paycheck and found that her earned vacation time and holiday pay had been appropriated by Defendant.

49.     Maria's final paycheck reflected that she was owed $ 8,561.60 (160 hours) in New York Paid Family Leave ("NYPFL"). Upon information and belief, Lincoln Financial Group ("LFG") was responsible for disbursing Defendant's NYPFL. Maria has received $ 7,578.55 from LFG, which is approximately the amount owed to her for NYPFL less 11.5% (presumably due to withholding).

50.     In addition to NYPFL, Maria's final paycheck stated that she was owed 96 hours of vacation, representing a "vacation balance" of $ 5,453.08, and $ 856.16 in holiday pay. However, Maria received only $ 2,500.02 – less than 40% of what she was owed.

    a.   This discrepancy was explained to Maria as "$ 6,421.20 & vacation balance $5,453.08 total was $ 11,874.28 - $8,561.60 (NYF non-pay code) = $3,312.68. Then minus your taxes and deductions [equals] $ 2,500.02."

    b.   This means that the $8,561.60 sum, which was drawn from an employee-funded NYPFL fund, ultimately went toward reimbursing BSA for its payroll liabilities (i.e., Maria's final paycheck) – not to Maria herself.

    c.   If true, this would be larceny. *See Larceny; defined*, N.Y. Penal Law § 155.05 ("1. A person steals property and commits larceny when, with intent to deprive another of property or to appropriate the same to himself or to a third person, he wrongfully takes, obtains or withholds such property from an owner thereof.")

51.     When Maria contacted Payroll to inquire about her earned vacation time and final paycheck, agents of defendant dismissed her concerns and refused to answer her questions in writing.

52.     There were numerous other issues and inconsistencies with Maria's final paycheck, which Payroll agents were not able to satisfactorily explain:

    a.   BSA appears to have subtracted 40 hours of "Vacation Buy Entitlement" from Maria's paycheck. However, Maria had not been enrolled in "Vacation Buy" during the pay period. When Maria brought this to the attention of the BSA payroll department, its specialist explained that "you still had to be refunded to what you

contributed throughout the year." This suggests that "Vacation Buy" should have been added to her paycheck, not subtracted from it.

b. BSA also docked 56 hours of "Regular Pay" from Maria's final paycheck. This was explained as a mandatory 35% pay cut during her 160 hours of maternity leave. However, because Maria's maternity leave was paid for by the NYPFL fund and disbursed by LFG, this was effectively a transfer of money from the employee-funded NYPFL fund to Defendant's corporate coffers.

c. The 96 hours figure represents only 8 months of vacation. As explicated by a member of the payroll department, Defendant categorically discarded any vacation accrual from August or September (while Maria was recovering from a C-Section), December (although Maria was formally employed for 15 out of 22 workdays in December), and January (despite her planned maternity leave including 10 out of the 20 workdays in January).

**Effect on Maria's Maternity Leave**

53.     Due to her involuntary termination and the process that led to it, Maria had to spend her "maternity leave time" defending herself instead of recovering after a serious surgery and bonding with her newborn baby.

54.     Maria spent a significant amount of time responding to Defendant, putting paperwork together from her doctor, making calls to automated answering services, and otherwise attempting to avoid the premature termination of her tenure track appointment.

**Effect on Maria's Science Career**

55.     Defendant did not merely deprive Maria of a job; its actions hamstrung her career as a scientist.

56.     Maria rejected an offer at West Virginia University to take the position as Assistant Physicist at BNL, in significant part because of the prestige of BNL and the opportunities for professional advancement that her appointment would offer.

57.     Maria's two-year appointment as an Assistant Physicist at BNL was a "tenure track" appointment. A tenure track position is difficult to obtain – the competition is furious – and serves as an important stepping stone in a young scientist's career.

58.     Career opportunities for scientists are substantially predicated upon affiliation with an institution like BNL or with a university. For example, the National Science Foundation Faculty Early Career Development Program is only available for those in a tenure track position like the one from which Maria was terminated. *See* National Science Foundation, *Faculty Early Career Development Program (CAREER)* (https://www.nsf.gov/pubs/2022/nsf22586/nsf22586.pdf).

59.     Consequently, Maria's career trajectory has been hampered by the loss of her appointment and injury to her reputation. Her career as a scientist has been imperiled by her termination.

**Right to Sue**

60.     Maria obtained a right to sue letter from the U.S. Equal Employment Opportunity Commission ("EEOC") on September 30, 2022.

<u>**FIRST CAUSE OF ACTION**</u>
**Disability Discrimination – ADA**

61.     Plaintiff repeats and re-alleges the foregoing allegations contained in the preceding paragraphs as if fully set forth herein.

62.     Plaintiff is protected by the Americans with Disabilities Act, 42 U.S.C. §12101 et seq. ("ADA") from disability discrimination in the workplace. The ADA specifically provides "a

14

clear and comprehensive national mandate for the elimination of discrimination against individuals with disabilities." 42 U.S.C. §12101. It provides that "No covered entity shall discriminate against a qualified individual on the basis of disability in regard to job application procedures, the hiring, advancement, or discharge of employees, employee compensation, job training, and other terms, conditions, and privileges of employment." 42 U.S.C. §12112.

63.     Defendant is a "covered entity" pursuant to 42 U.S.C. §12111 that is subject to ADA jurisdiction because it is an "employer" as defined by the ADA ("a person engaged in an industry affecting commerce who has 15 or more employees for each working day in each of 20 or more calendar weeks in the current or preceding calendar year").

64.     Plaintiff is "disabled" within the meaning of 42 U.S.C. §12102, which defines disability as (A) a physical or mental impairment that substantially limits one or more major life activities of such individual; (B) a record of such an impairment; or (C) being regarded as having such an impairment.

      a.   Plaintiff has Hashimoto's Thyroiditis, a condition "in which the body's immune system mistakenly attacks the thyroid gland." SSR 14-3p: Titles II and XVI: *Evaluating Endocrine Disorders Other Than Diabetes Mellitus*, 79 Federal Register 31380 (Effective June 2, 2014).

      b.   Hashimoto's Thyroiditis is a form of chronic hypothyroidism and causes dizziness, fatigue, and memory loss, which inhibit "major life activities" per the ADA.

      c.   Hashimoto's Thyroiditis also inhibits "major life activities" because it is an autoimmune thyroid disease ("AITD") that deleteriously effects the function of Plaintiff's immune system. *See* 42 U.S.C.A. § 12102 (2)(b) ("a major life activity

also includes the operation of a major bodily function, including but not limited to, functions of the immune system…")

d. Hashimoto's Thyroiditis is a lifelong ailment that can only be controlled by daily medication. *See* 42 U.S.C.A. § 12102 (4)(D) ("An impairment that is episodic or in remission is a disability if it would substantially limit a major life activity when active.")

65. Despite her well-documented condition (Hashimoto's Thyroiditis), Plaintiff was fully able to adequately perform all of the necessary functions of a tenure track Assistant Physician at BNL.

66. Plaintiff could not safely obtain "vaccinated" status because her condition, in conjunction with other health factors, made it dangerous and medically inadvisable for her to receive a Covid-19 inoculation.

a. Due to her Hashimoto's Thyroiditis, Maria is immunocompromised.

b. Autoimmune thyroid diseases ("AITDs") require ongoing monitoring and medication to avoid serious long-term complications such as hypothyroidism.

c. Medications that stop Hashimoto's from developing into hypothyroidism have numerous drug interactions. *E.g.*, https://www.pfizermedicalinformation.com/en-us/levoxyl/drug-interactions (Pfizer, the developer of Levoxyl, notes that there are "many" drug interactions with the thyroid medication).

d. Maria's doctor (Dr. Gil) made a cogent determination that a COVID-19 inoculation was not safe or medically viable intervention in Maria's case.

67. Plaintiff notified Defendant of her disability (Hashimoto's Thyroiditis) and of her inability to safely engage in conduct required by Defendant (obtain a medical intervention that her

doctor deemed unsafe and medically inadvisable for her), which inability was a direct result of her disability.

68.     Plaintiff suffered adverse action when Defendant and its agents subjected her to terms and conditions of employment that were intolerable due to her condition, resulting in constructive discharge.

69.     Defendant failed to reasonably accommodate Plaintiff's disability, as required by law. A medical exemption or other accommodation, such as telework or weekly testing, would have been at least as effective (and, in fact, *more* effective) at ensuring that Maria was not a vector of transmission. Furthermore, Maria was on maternity leave for the entirety of the period in question and could not possibly have posed a transmission risk while on maternity leave.

70.     Defendant did not give Maria's exemption application fair and adequate consideration, reasonable due process, or an opportunity to clarify or appeal.

71.     Defendant offered Maria's requested accommodation (a medical exemption from the Inoculation Mandate) to its employees. Some similarly situated employees actually received the exact accommodation that Maria requested.

72.     Defendant's actions, inactions and communications manifested animus against Maria because of her disability.

73.     Defendant's actions, inactions and communications manifested animus against individuals who did not obtain a COVID-19 inoculation, including animus against individuals who, like Maria, had a clearly diagnosed medical condition that impedes a major life activity (i.e., a disability) and was advised by a certified doctor not to receive the jab.

74.     Due to Defendant's willful violations of the ADA, Plaintiff was damaged and is entitled to recover compensatory damages, back and front pay, punitive damages, reasonable attorneys' fees and costs of the action, pre- and post-judgment interest.

## SECOND CAUSE OF ACTION
### Sex Discrimination - Title VII

75.     Plaintiff repeats and re-alleges the foregoing allegations contained in the preceding paragraphs as if fully set forth herein.

76.     Plaintiff is protected by Title VII of the Civil Rights Act of 1964, 42 U.S.C. §2000e et seq. ("Title VII") from discrimination in her workplace based on her sex. The statute provides that it is an unlawful employment practice "to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin." 42 U.S.C. §2000e-2.

77.     The Pregnancy Discrimination Act of 1978 amended Title VII to state: "The terms 'because of sex' or on the basis of sex' include, but are not limited to, because of or on the basis of pregnancy, childbirth, or related medical conditions; and women affected by pregnancy, childbirth, or related medical conditions shall be treated the same for all employment-related purposes, including receipt of benefits under fringe benefit programs, as other persons not so affected but similar in their ability or inability to work." 42 U.S.C.A. § 2000(e)(k).

78.     Defendant is Plaintiff's employer pursuant to Title VII and is within the jurisdiction of the statute. The statute provides that "employer" means "a person engaged in an industry affecting commerce who has fifteen or more employees for each working day in each of twenty or more calendar weeks in the current or preceding calendar year, and any agent of such a person." 42 U.S.C. §2000e.

79.     Plaintiff was qualified for her position.

80.     Plaintiff suffered an adverse employment action when she was constructively terminated from her employment.

81.     Plaintiff suffered an adverse employment action when her maternity leave was terminated prematurely.

82.     Plaintiff was subjected, by Defendant and its agents, to discrimination based on her sex when Defendant terminated her employment and maternity leave.

83.     Defendant and its agents subjected Plaintiff, a woman on maternity leave, to sex discrimination by treating her differently than similarly situated men who were not on maternity leave:

     a.   Maria is a woman and was on maternity leave.

     b.   Two of her coworkers, Dennis Doherty and Matthew DiLeone, are men. They were not on maternity leave.

     c.   Doherty, DiLeone, and Maria applied for medical exemptions and were denied.

     d.   Maria was terminated for failure to comply with the inoculation mandate.

     e.   Doherty and DiLeone were not fired for the same "offense."

84.     Due to Defendant's willful violations of Title VII, Plaintiff was damaged and is entitled to recover compensatory damages, back and front pay, punitive damages, reasonable attorneys' fees and costs of the action, pre- and post-judgment interest.

### THIRD CAUSE OF ACTION
### Disability Discrimination - NYSHRL

85.     Plaintiff repeats and re-alleges the foregoing allegations contained in the preceding paragraphs as if fully set forth herein.

86.     Plaintiff is protected by New York State Executive Law § 296 (the "New York State Human Rights Law" or "NYSHRL") because she worked in New York State and the discrimination she experienced had an impact in the jurisdiction.

87.     The elements of a *prima facie* cause of action for disability discrimination under NYSHRL are substantially similar to those of the ADA. Thus, because Defendant's discrimination and retaliation violates federal law, it necessarily violates NYSHRL. However, NYSHRL is <u>more</u> broadly protective of employees than federal law and offers more comprehensive non-economic damages than federal law. For example, an impairment need not substantially limit a major life activity to merit protection under NYSHRL.

88.     Defendant was Plaintiff's "employer" for purposes of NYSHRL.

89.     Plaintiff has a "disability" within the meaning of NYSHRL because she has Hashimoto's Thyroiditis, a condition "in which the body's immune system mistakenly attacks the thyroid gland." SSR 14-3p: Titles II and XVI: *Evaluating Endocrine Disorders Other Than Diabetes Mellitus*, 79 Federal Register 31380 (Effective June 2, 2014).

90.     Despite her well-documented condition, Plaintiff was fully able to adequately perform all of the necessary functions of a tenure track Assistant Physician at BNL.

91.     As determined by her physician, Plaintiff could not safely comply with the Inoculation Mandate because of her autoimmune condition, Hashimoto's Thyroiditis.

92.     Plaintiff notified Defendant of her disability (Hashimoto's Thyroiditis) and of her inability to safely engage in conduct required by Defendant (obtain a medical intervention that her doctor deemed unsafe and medically inadvisable for her), which inability was a direct result of her disability.

93.     Plaintiff suffered adverse action when Defendant and its agents subjected her to terms and conditions of employment that were intolerable due to her condition, resulting in constructive discharge.

94.     Defendant failed to reasonably accommodate Plaintiff's disability, as required by law. A medical exemption or other accommodation, such as telework or weekly testing, would have been at least as effective (and, in fact, *more* effective) at ensuring that Maria was not a vector of transmission. Furthermore, Maria was on maternity leave for the entirety of the period in question and could not possibly have posed a transmission risk while on maternity leave.

95.     Defendant did not give Maria's exemption application fair and adequate consideration, reasonable due process, or an opportunity to clarify or appeal.

96.     Defendant offered Maria's requested accommodation (a medical exemption from the Inoculation Mandate) to its employees. Some similarly situated employees actually received the exact accommodation that Maria requested.

97.     Due to Defendant's willful violations of the NYSHRL, Plaintiff was damaged and is entitled to recover compensatory damages, back and front pay, punitive damages, reasonable attorneys' fees and costs of the action, pre- and post-judgment interest.

## FOURTH CAUSE OF ACTION
### Sex Discrimination - NYSHRL

98.     Plaintiff repeats and re-alleges the foregoing allegations contained in the preceding paragraphs as if fully set forth herein.

99.     Plaintiff is protected by New York State Executive Law § 296 (the "New York State Human Rights Law" or "NYSHRL") because she worked in New York State and the discrimination she experienced had an impact in the jurisdiction.

100.    The elements of a *prima facie* cause of action for sex discrimination under NYSHRL are substantially similar to those of Title VII. Thus, because Defendant's discrimination and retaliation violates federal law, it necessarily violates NYSHRL. However, NYSHRL is <u>more</u> broadly protective of employees than federal law and offers more comprehensive non-economic damages than federal law.

101.    Furthermore, NYSHRL makes it illegal "For an employer to compel an employee who is pregnant to take a leave of absence, unless the employee is prevented by such pregnancy from performing the activities involved in the job or occupation in a reasonable manner." N.Y. Exec. Law § 296 (1)(g); *see also* N.Y. Exec. Law § 296(3)(a) ("It shall be an unlawful discriminatory practice for an employer … to refuse to provide reasonable accommodations to the known disabilities, or pregnancy-related conditions, of an employee").

102.    Defendant was Plaintiff's "employer" for purposes of NYSHRL.

103.    Plaintiff was qualified for her position.

104.    Plaintiff suffered an adverse employment action when she was constructively terminated from her employment.

105.    Plaintiff suffered an adverse employment action when her maternity leave was terminated prematurely.

106.    Plaintiff was subjected, by Defendant and its agents, to discrimination based on her sex when Defendant terminated her employment and maternity leave.

107.    Defendant and its agents subjected Plaintiff, a woman on maternity leave, to sex discrimination by treating her differently than similarly situated men who were not on maternity leave:

    a.   Maria is a woman and was on maternity leave.

   b.   Two of her coworkers, Dennis Doherty and Matthew DiLeone, are men. They were not on maternity leave.

   c.   Doherty, DiLeone, and Maria applied for medical exemptions and were denied.

   d.   Maria was terminated for failure to comply with the inoculation mandate.

   e.    Doherty and DiLeone were not fired for the same "offense."

108.    Due to Defendant's willful violations of NYSHRL, Plaintiff was damaged and is entitled to recover compensatory damages, back and front pay, punitive damages, reasonable attorneys' fees and costs of the action, pre- and post-judgment interest.

## FIFTH CAUSE OF ACTION
### Breach of Contract

109.    Plaintiff repeats and re-alleges the foregoing allegations contained in the preceding paragraphs as if fully set forth herein.

110.    On January 20, 2021, Defendant offered Plaintiff an appointment as Assistant Physicist in the BNL Photon Sciences department. Plaintiff accepted and began work for Defendant on or about January 25, 2021. An employment relationship between the two parties existed until Plaintiff's dismissal in December 2021.

111.    The employment agreement between the parties (the "Contract") was governed by an offer letter dated January 20, 2021, and the Scientific Staff Manual (2018).

112.    The Contract expressly states that plaintiff's appointment was to be effective from January 25, 2021 (the "start date") until September 30, 2023 (the "expiration date"). *See* January 20 offer letter.

113.    The Contract made no mention of a COVID-19 inoculation or "vaccine." It did not contemplate a requirement that Maria would have to obtain a COVID-19 inoculation at any point

in the future. It certainly did not contain language manifesting that Maria may have to receive a medical intervention, against the judgment of her physician, as a condition of employment.

114. Maria's appointment was a "tenure track appointment" subject to the conditions contained in the Scientific Staff Manual. Per the Manual, the rank of "Assistant Scientist" entails a "term appointment." Scientific Staff Manual § 2 (2018).

115. The Scientific Staff Manual states: "A term appointment or any renewal or extension thereof shall not be revoked prior to the stated expiration date except for enforcement of DOE contractual provisions, or by reason of financial exigency, or for disability, or for adequate cause." *Id.* § 2.

116. Maria's term appointment was revoked prior to the stated expiration date of September 30, 2023.

    a. Breach of DOE contractual provisions was not the reason for her termination.

    b. Financial exigency was not the reason for her termination.

    c. Disability was not the (stated) reason for her termination.

    d. Maria was not terminated "for cause."

117. The Scientific Staff Manual further states that "a termination for other than cause… will not take effect during an employee's first year at the Laboratory." *Id.* § 2.

118. Furthermore, regarding "for cause" termination, the Scientific Staff Manual states: "Termination for cause may be effected only after a hearing before a committee appointed by the Laboratory Director and including at least one representative from the BNL Council." *Id.* § 2.

    a. Maria was afforded no such hearing.

    b. No committee was appointed by the Laboratory Director for such a purpose.

    c. Maria was not represented by a representative from the BNL Council at any point.

119.     Defendant willfully breached the Contract when it changed the conditions of plaintiff's employment by requiring plaintiff to receive a COVID-19 inoculation notwithstanding her medical condition (Hashimoto's Thyroiditis). This condition was not bargained-for by Plaintiff, who would not have entered the contract had this been a condition of her employment.

120.     Defendant further breached the Contract when it enforced this new, illegitimate condition of employment by removing Maria from its payroll.

121.     Defendant also breached its obligations when it moved up her inoculation timeline, cut short Maria's maternity leave, and attempted to move up her final day from December 21 to December 14.

122.     Defendant also breached its obligations when it failed to give Maria the vacation pay that she was entitled to.

123.     As a result of these breaches, Maria was subjected to a hostile work environment, endured harassment, was deprived of financial and other benefits, was suspended or otherwise barred from doing her job, her maternity leave was prematurely terminated, and she was ultimately terminated.

124.     Consequently, Maria did not receive the benefits of the Contract. She did not have paid employment through September 30, 2023. She was deprived of the benefits associated with the bargained-for employment. And she was stripped of a valuable "tenure-track" position that would have advanced her career.

125.     Maria also suffered from mental and emotional distress as a direct result of the breach, hostility, and unceremonious termination *during her recovery from a C-Section and subsequent maternity leave.*

126.    Due to Defendant's willful breach of contract, Plaintiff is entitled to recover compensatory damages, expectation damages, damages for emotional trauma and distress, back and front pay, reasonable attorneys' fees and costs of the action, and pre- and post-judgment interest.

**WHEREFORE**, Plaintiff respectfully prays that this Court grant the following relief against Defendant:

A.    Enter judgment on the First Cause of Action declaring that Defendant has violated the applicable law and that Defendant's violations of the law were willful; enjoining future violations of the law by Defendant; ordering that Plaintiff be reinstated to her former position; awarding Plaintiff front and back pay; awarding Plaintiff compensatory damages, including but not limited to damages for emotional pain and suffering and for lost fringe and related benefits; awarding Plaintiff punitive damages; awarding Plaintiff pre- and post-judgment interest; awarding Plaintiff reasonable attorneys' fees and costs; and awarding such other and further relief as the Court deems just and proper.

B.    Enter judgment on the Second Cause of Action declaring that Defendant has violated the applicable law and that Defendant's violations of the law were willful; enjoining future violations of the law by Defendant; ordering that Plaintiff be reinstated to her former position; awarding Plaintiff front and back pay; awarding Plaintiff compensatory damages, including but not limited to damages for emotional pain and suffering and for lost fringe and related benefits; awarding Plaintiff punitive damages; awarding Plaintiff pre- and post-judgment interest; awarding Plaintiff reasonable attorneys' fees and costs; and awarding such other and further relief as the Court deems just and proper.

C.     Enter judgment on the Third Cause of Action declaring that Defendant has violated the applicable law and that Defendant's violations of the law were willful; enjoining future violations of the law by Defendant; ordering that Plaintiff be reinstated to her former position; awarding Plaintiff front and back pay; awarding Plaintiff compensatory damages, including but not limited to damages for emotional pain and suffering and for lost fringe and related benefits; awarding Plaintiff punitive damages; awarding Plaintiff pre- and post-judgment interest; awarding Plaintiff reasonable attorneys' fees and costs; and awarding such other and further relief as the Court deems just and proper.

D.     Enter judgment on the Fourth Cause of Action declaring that Defendant has violated the applicable law and that Defendant's violations of the law were willful; enjoining future violations of the law by Defendant; ordering that Plaintiff be reinstated to her former position; awarding Plaintiff front and back pay; awarding Plaintiff compensatory damages, including but not limited to damages for emotional pain and suffering and for lost fringe and related benefits; awarding Plaintiff punitive damages; awarding Plaintiff pre- and post-judgment interest; awarding Plaintiff reasonable attorneys' fees and costs; and awarding such other and further relief as the Court deems just and proper.

E.     Enter judgment on the Fifth Cause of Action declaring that Defendant has breached the terms of the parties' employment contract and that Defendant's breach was willful; enjoining future violations of the contract by Defendant; ordering that Plaintiff be reinstated to her former position; awarding Plaintiff front and back pay; awarding Plaintiff compensatory damages, including but not limited to damages for emotional pain and suffering and for lost fringe and related benefits; awarding Plaintiff economic and expectation damages, including damages for injury to Plaintiff's career trajectory; awarding Plaintiff punitive damages; awarding Plaintiff pre- and post-

27

judgment interest; awarding Plaintiff reasonable attorneys' fees and costs; and awarding such other and further relief as the Court deems just and proper.

## JURY DEMAND

Plaintiff demands a trial by jury on all issues so triable.

Dated: December 8, 2022

LAW OFFICES OF SHELDON KARASIK, P.C.
Attorneys for Plaintiff

By:_____ /s/ *Sheldon Karasik*_____
Sheldon Karasik (SK-4020)
Law Offices of Sheldon Karasik, P.C.
244 Fifth Avenue, Suite Q249
NY, NY 10001
Direct Dial: (917) 587-8153
Email: sheldon@karasiklawoffices.com